(63 App. Div. 93.)

### CHRYSTAL v. MAYOR, ETC., OF THE CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. July 9, 1901.)

MUNICIPAL CORPORATIONS — SPECIAL CITY LAW—VALIDITY—SUBMISSION TO
      MAYOR—NECESSITY.
      Const. art. 12, § 2, provides that laws relating to the property, affairs,
      or government of a city are special city laws, when they relate to a
      single city, and that, after any bill for a special city law relating to any
      city has been passed by both branches of the legislature, the house in
      which it originated shall immediately transmit a copy to the mayor of
      such city, who shall return it to the governor, with a certificate stating
      whether it has been accepted by the city or not. *Held*, that Laws 1895,
      c. 167, authorizing the widow of a contractor who had constructed a
      city market in New York, and her assigns, to sue for a balance due on
      the contract, notwithstanding the claim was barred by limitations, con-
      stituted a special city law, and the failure to transmit a copy to the
      mayor rendered it invalid.

Appeal from trial term, New York county.

Action by John P. Chrystal against the mayor, aldermen, and com-
monalty of the city of New York. Plaintiff's motion for a new trial
on exceptions to the dismissal of the complaint was ordered heard in
the first instance in the appellate division. Exceptions overruled.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN,
O'BRIEN, and INGRAHAM, JJ.

Delos McCurdy, for plaintiff.
Terence Farley, for defendant.

INGRAHAM, J. The sole question presented upon this appeal is
whether chapter 167 of the Laws of 1895 was a special city law, which
was required by article 12 of section 2 of the constitution to be trans-
mitted to the mayor of the city of New York for his approval. The
claim against the city which the plaintiff seeks to enforce arose un-
der chapter 120 of the Laws of 1865. By that act commissioners
were appointed for the erection of a public market in the Eighteenth
ward of the city of New York. The said commissioners were directed
to have prepared plans and specifications, to advertise for proposals
for the erection of the said building and work necessary for the com-
pletion of said market, and to award the contract to the lowest bid-
der therefor. The commissioners were to keep full minutes of their
proceedings, and file a true copy thereof with the clerk of the com-
mon council of the city of New York. The mayor, aldermen, and
commonalty of the city of New York were authorized and directed to
create a public fund or stock, to be denominated "Market Stock," to
the amount of $75,000; to sell and dispose of said stock, and to pay
over the proceeds thereof to such persons as said commissioners, or
a majority of them, should by their draft or order direct in writing;
the said stock to be paid by taxation; the entire expenditure author-
ized by the act not to exceed the sum of $75,000. In pursuance of
this statute the commissioners made a contract with one Vander-
voort to erect the building for the sum of $70,404. Vandervoort pro-
ceeded under this contract, and on June 18, 1870, a certificate was
issued by the commissioners and the architect, which certified that

there was due to Vandervoort for the erection of the market the sum of $67,291.97. Certain payments had been made on account of the contract, and it is alleged that there was a balance due from the city of $36,674.30. The last payment that was made to Vandervoort under the contract was on June 16, 1871, when he received the sum of $3,026.89. Various proceedings seem to have been taken by Vandervoort to collect the balance claimed by him, which seem to have been ineffectual. It will be noticed that there is no provision in this statute making the city of New York liable in an action at law for the amount due under the contract. The payment to the contractor of the amount due under the contract imposes an obligation upon the comptroller to issue city stock to the amount of $75,000, directing him to sell such stock, and to pay the amount realized therefrom to such persons as the commissioners, or a majority of them, should direct in writing; the money realized from said stock to be applied solely and only to the erection and completion of the public market before specified. The record does not disclose what amount of the stock authorized to be issued by this act was actually issued, or what disposition was made of the proceeds thereof; but whatever claim the plaintiff had against the city of New York was many years ago barred by the statute of limitations, and before the passage of the act in question no enforceable obligation of the city of New York in favor of the contractor existed. Vandervoort, the contractor, died, leaving a last will and testament, whereby he gave all of this property, both real and personal, to his wife, and appointed her sole executrix. Letters testamentary were issued on the 8th of October, 1874; and on January 11, 1892, Vandervoort's widow, individually and as executrix, assigned this claim against the city of New York to the plaintiff in this action. The claim against the city being thus barred by the statute of limitations, the two houses of the legislature passed an act entitled "An act for the relief of Sophia G. Vandervoort, widow of Charles Vandervoort, deceased, her successors or assigns," which was approved by the governor on March 26, 1895. By this act Sophia Vandervoort, widow and executrix of Charles Vandervoort, late of the city of New York, deceased, her successors or assigns, were authorized to commence an action in the supreme court of this state against the mayor, aldermen, and commonalty of the city of New York—

"To recover any moneys due and unpaid to said Charles Vandervoort in his lifetime for or growing out of the erection of a market in the Eighteenth ward of said city; and to prosecute such action to final judgment on the merits, any statute, law or decision to the contrary notwithstanding." °

The act further provided:

"No audit of the claim of said Vandervoort, his successors or assigns, by the mayor and comptroller or either of them or any other person or persons, shall be necessary before the commencement of such action, nor shall any rejection of or refusal or failure to allow or audit said claim by any officer or officers of the city be any defense to said action, which action shall be prosecuted to final judgment in the same manner and with the same effect as if such audit or rejection had not been made;" that the action authorized "may be commenced and prosecuted to final judgment upon the merits in the same manner and with the same effect as if the same had been commenced immediately after the said market was created"; that the plaintiff

71 N.Y.S.—23

in the action "hereby authorized shall be entitled to judgment therein for such sum of money, if any, as was justly due said Charles Vandervoort for the erection of said market, with interest from the time when it was so due, any audit, judgment, decision, record or proceeding to the contrary notwithstanding"; and that all acts or parts of acts inconsistent with the act were repealed.

It was admitted by the parties on the trial that a certified copy of this act was not transmitted to the mayor of the city of New York by the house in which the same originated, or by either house; that the mayor did not return the same to the house from which it was sent during the session of the legislature, with the mayor's certificate thereon, stating whether the city had or had not accepted the same; and that the provision of section 2 of article 12 of the state constitution was not complied with. By this section of the constitution the cities of the state are classified, cities of the first class including all cities having a population of 250,000 or more. Laws relating to the property, affairs, or government of cities, and the several departments thereof, are divided into general and special city laws. General city laws are those which relate to all the cities of one or more classes. Special city laws are those which relate to a single city, or to less than all the cities; and special city laws shall not be passed, except in conformity with the provisions of this section, which, it is agreed, were not complied with. If the act, therefore, is a special city law, it was never passed in conformity with the provisions of the constitution, and never became a law of the state. This law applies to but one city, viz. the city of New York, and is concededly a special city law if it relates to the "property, affairs or government of cities." The court below held that this law did relate to the property, affairs, or government of the city of New York, and in that conclusion we agree. The contract out of which this claim arose was to provide the city of New York with a public market. From the earliest time one of the objects of the incorporation of the city of New York was to provide market facilities for the inhabitants of the city, and the city was authorized to own and maintain markets. The Dongan charter recites that the city had erected two market houses, and grants to the city authority to keep their market days weekly. See, also, the Cornbury charter and Montgomerie charter. The maintenance of markets was distinctly a city purpose, authority to procure and maintain which was vested in the city. This act of 1865, which was passed for the purpose of constructing for the city of New York a market, was therefore a law relating to the city, providing for the construction of a market upon property belonging to the city, and for the payment for erecting that market by an issue of obligations of the city. The act itself specifically affects the property of the city, and provides for improving such property by the city, and for the·expense of such improvement. It is unnecessary to attempt to define strictly the limit of this provision of the constitution. Its object was to allow a city of the state information of acts before the legislature solely affecting its interest, and an opportunity to communicate to the legislature any objection which existed to the passage of the proposed act. It provided that before the legislature passed such an act it should be communicated to the city authorities,

so that they could communicate to the legislature any objection that existed to the passage of the act. Many acts had been passed imposing obligations upon the cities of the state without the cities affected having an opportunity to protest against the legislation; and the beneficial results of this constitutional provision would be almost entirely nullified if it were held not to apply to those laws which imposed upon the city an obligation to pay money to an individual, where no obligation which could be enforced existed. The effect of this act would be to grant a pure gratuity to this plaintiff. The original contractor had presented his claim and sought to enforce it by legal proceedings. These proceedings had failed, and it. must be presumed that some legal objection to the right of the contractor to recover existed. Twenty-five years had passed since the contract was completed, and the ability to prove a defense to the claim would be severely impaired by the lapse of time. If such a legal defense had not existed, it is inconceivable that the right of the contractor to enforce his claim against the city would not have succeeded; and now, when it must be presumed that the city has lost the power of proving such a defense, the legislature, without notice to the city, passes an act, the effect of which is to compel the city to pay this claim, with interest. It is inconceivable that, if the legislature had had notice of the conditions existing and the effect of the act, it would have insisted upon passing it against the protest of the city, or that under such circumstances the governor would have signed it. But we have no doubt that any act requiring a specified city to pay to a person in whose favor no legally enforceable claim exists a sum of money, and authorizing such person to commence and maintain an action against the city to recover it, is an act that relates to the "government, property or affairs" of the city, and is within the provisions of the constitution above referred to. The question that is presented is not as to the constitutional power of the legislature to pass this act. It is whether or not the legislature has complied with the provisions of the constitution in the passage of the act. These constitutional provisions are remedial in their nature, for the protection of the cities of the state; and there is no reason why they should not receive a broad and liberal construction, which would carry out the beneficial intention of the people in providing that these special city acts should not be passed without giving to the municipalities an opportunity to present such objections as exist to their passage.

It follows that the exceptions should be overruled, and the motion for a new trial denied, with costs. All concur.